## Case No. 4,224.

### DYER et al. v. NATIONAL STEAM NAV. CO.

[3 Ben. 173.][1]

District Court, E. D. New York. March, 1869.[2]

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]
[2] [Affirmed and modified in Case No. 4,225.]

E. C. Benedict and Scudder & Carter, for libellants.

C. Donohue and John Chetwood, for respondents.

BENEDICT, District Judge. This is a cause of damage arising out of the following circumstances: The ship Kate Dyer owned by the libellants was, on the night of the eighth day of September, 1866, off Fire Island, bound from Callao to New York, fully laden. The night was dark, and bitter cold, but starlight, and a ship's lights could be seen for several miles. The wind was blowing fresh from the north north-west, and the ship was sailing to westward, close hauled upon the starboard tack at a speed of about seven and a half knots, with all the proper lights displayed and in charge of a pilot.

The steamer Scotland, owned by the defendants, and bound from New York to Liverpool, was proceeding at a speed of ten to eleven knots, upon a course declared by the officer of the deck to be due east, and by the master to be southeast three fourths east, displaying also the proper lights. The two vessels came in contact at about right angles, the steamer striking the starboard bow of the ship, and having at the time sufficient headway to carry her over the ship and for a considerable distance to leeward before she was stopped.

The effect of the collision was such as to cause the ship to go to the bottom so rapidly that twelve of the persons on board, including the mate, were drowned, while the steamer herself was so injured that although at once put about she could only reach the Outer Middle, when she sunk and became also a total loss. This action is brought to recover the damages caused by the loss of the Dyer, her cargo and freight, amounting in all to some $255,000.

The averments of the libel, bearing upon the points in controversy upon the evidence, are that the night was fine and clear and the ship close-hauled; that the masthead light of the steamer was seen about two points over the starboard bow of the ship and distant two and a-half to three miles; that the ship held steadily to her course, and, as the light approached, it grew broader and broader abeam, but closer and closer to the ship, and it was apparent that the steamer was attempting to cross the ship's bows, with her helm nearly or quite hard a-port; that danger seeming imminent, the ship's helm was put hard up and the spanker let go, but, before the orders could be obeyed, the steamer came into the ship at full speed striking her upon the starboard bow.

The answer admits that the night was clear, and avers that the steamer's lights could be seen at a much greater distance than three miles; that the Scotland was on a course about east, and, while so heading, discovered the lights of the ship about one and a-half points off the port bow; that in order to give the ship a wide berth, and when the ship was at least three to four miles off, the helm of the steamer was ported, altering her course to starboard, as she proceeded; that, thereafter, the persons in charge of the steamer discovered that the ship was falling off to the southward and down on the steamship, and that the only thing then left for the steamer was, to put her helm hard a-port and stop and back, which she did, and at the time of collision had changed about four points, being struck by the ship on her port bow.

The evidence produced in support of these respective averments is contradictory, and, in some particulars, unsatisfactory. I have given to the difficulties which it presents my best attention, and, after careful consideration, am of the opinion that little doubt can be entertained as to what should be the proper decree. It will be more convenient to examine first the evidence introduced by the steamer in regard to her own movements.

This evidence presents certain features, and discloses certain attendant circumstances, which at the outset challenge attention. For it appears that the starboard watch of the steamer was on duty, but, up to the time of the alarm, the master was below at supper—that the second officer was in charge of the deck, but was not at his proper station upon the upper bridge, until after the ship was reported—that two men are stated to have been stationed on the lookout forward, but neither of them is produced, and the omission is unexplained—that two men were at the wheel, but neither of them is produced by the claimant and they are called by the libellants—that no witness called from the steamer is able to say which of the side lights of the ship was presented to the steamer, although it is beyond question that these lights were plainly to be seen, and, according to the theory of the defence, the ship was seen at a distance of some miles and watched till she struck.

These circumstances become significant when the accounts of the collision given by these witnesses are examined.

Turning then to these accounts, a careful comparison of the various statements of fact renders it quite apparent that the attention of the officer in charge of the movements of the steamer was not fastened upon the

ship, until she was near enough to show her sails, and so close that, although the helm of the steamer was put hard-a-port, and the engine stopped and reversed at full speed, she struck the ship before her headway was seriously reduced.

If this be so, the steamer must be held in fault. She was sailing at a rapid rate, in a locality requiring the utmost watchfulness on account of the danger of meeting vessels. By the exercise of a proper care, the ship could have been seen. and her course determined, in abundant time to have enabled the steamer to take, with proper deliberation, steps to avoid her, and the failure to give proper attention to the approaching ship, in time to avoid her, was negligence.

In coming to the conclusion that the ship was not seen by the officer of the deck until she was close upon him, I have not overlooked those portions of the testimony which are relied on as supporting the averments of the answer, that the ship was seen at a distance, and the steamer's helm then ported. But estimates of time and of distance cannot be relied upon. and here they are overborne by the sequence of events stated by these witnesses, which shows that when the helm of the steamer was first changed, it was got hard down as soon as possible; and that this was simultaneous with the stoppage and reversal of the engines; and that all this was done as soon as the second officer ascended the bridge. The engine was reversed by Hunt, the third officer, who hastened from below on hearing the order to shift the wheel, and the ship was, as he says, then only 200 yards distant.

This failure sooner to notice the ship, and take steps to avoid her, may have arisen from the absence of an attentive lookout, or from a failure on the part of the officer of the deck to observe the reports of the lookout, if any such there were, and in this connection the omission to produce either of the men claimed to have been upon the lookout is very noticeable; while the statement of one of the crew of the steamer, who was upon the forecastle. and is called by the libellants, that the first report of the ship's light from the forecastle received no attention, tends to increase the significance of the omission. The statement of this witness is. moreover, strengthened by the circumstance that, although the deposition containing the statement was taken in December, 1866, and the witness then named several others of the crew who were on the forecastle with him, none of those witnesses are called to contradict him.

But, assuming it to be true, as claimed on the part of the steamer, that the ship was seen when three or four miles off, and that the steamer's helm was then ported, she would still be guilty of negligence, in not sooner stopping her engine.

The witnesses from the steamer declare that, from the time the ship's light was seen, up to the moment of the collision, the bearing of the ship, in reference to the steamer, did not change. According to this theory. then, the steamer, at a distance of three or four miles, began sheering to leeward, and actually made a leeway of a mile before coming in contact with the ship. during all which time it was apparent from the bearing of the ship's light, that the change of course in the steamer was not changing the relative bearings of the vessels. Under such circumstances, it was the duty of the steamer, as soon as it was noticed that she was not shaking off the light by porting her helm, to have slackened her speed, and ascertained the direction in which the ship was sailing, and acted accordingly; instead of which, she kept up her full speed till the collision was inevitable. It cannot be doubted that, if the steamer, at the distance of a mile, even. had stopped her engine, no collision would have occurred. Whether, then, it be considered that the Scotland failed to pay proper attention to the ship until close upon her, or that, having seen her at the distance of three or four miles, she continued at full speed until the collision was inevitable, running in the interval a mile to leeward of her course, with the ship's light all the time bearing within a point or two of her port bow, it must be held that the steamer was guilty of negligence.

There only remains, then, to consider whether any fault is shown on the part of the ship, which conduced to the collision. The principal fault charged upon her is, that she did not hold her course, but kept away, falling off to the southward, and down upon the steamship.

In considering the evidence bearing upon this point, it is to be noticed that no witness produced on behalf of the steamer testifies that he saw any change whatever in the ship's course; and, as before remarked, although the ship was displaying the proper colored lights, which, in the language of the sea, proclaimed her course to the steamer, if observed by her, no witness on the part of the steamer is able to say which side light the ship displayed to the steamer—a fact, by the way, entirely consistent with the conclusion that when the ship was first seen by the persons in charge of the steamer, she was too near, and the danger too imminent, to warrant any observation of her side lights, but difficult to reconcile with the statement that the ship was watched for the space of three or four miles.

The only evidence in the case, then, going to show a change of course on the part of the ship, is the statement of the claimants' witnesses, that when they saw the sails of the ship, it was evident that she was off the wind, and off from her proper course. But when the ship's sails were seen, she was close at hand. and this evidence is, therefore, entirely consistent with the statement of the

pilot, second officer and wheelsman of the ship, that no change in their course was made until the steamer was seen to be approaching them at full speed and close by, when the wheel was put hard up and the spanker sheet let run. As contradicting this evidence on the part of the libellants, and supporting the account that the ship kept away when at a distance from the steamer, the claimants have laid great stress upon the evidence that the ship's light was seen over the steamer's port bow and that the green light of the steamer was not seen on board the ship, which it is insisted shows that the ship was to northward of the steamer and, therefore, must have kept away to the southward and towards the steamer in order to be found in her track.—But if the ship were to northward of the steamer and if, as the claimants insist, the steamer was continually bearing to the south, inasmuch as the ship was running only seven and a half knots to the steamer's ten, it is not easy to see how it would be possible for the ship to get in advance of and to southward of the steamer so as to be found in her track—while on the other hand, if the ship was on a course west half south and the steamer on the course stated with great particularity by her master to be south of east, the ship might be to southward of the steamer and yet be seen over the steamer's port bow, while the steamer would be seen over the ship's starboard bow. The red light of the steamer would thus be displayed to the ship and the green light at no time visible, while the green light of the ship would be displayed to the steamer, giving her notice that she was crossing the course of the ship.

I am unable, therefore, to say that the evidence in regard to the light seen from the respective vessels—which is by no means free from contradictions—will justify the conclusion that the collision was caused by the ship's falling away to leeward and towards the steamer.

As bearing upon this point, stress has also been laid upon evidence in the cause showing that the persons in charge of the ship believed the steamer to be a tug, and it has been insisted that this circumstance renders it highly probable that the ship did keep away, in order to meet her—a course otherwise improbable as the ship was situated.

But the movements of the ship do not appear to me to indicate any intention on her part to speak to or be taken in tow by the supposed tug, and I am unable to discover from the evidence, that the supposition that the steamer was a tug, had any effect upon the course of the ship.

My conclusion, therefore, upon this branch of the case, is that the collision cannot be attributed to the fault of the ship, in not holding her course.

The only remaining question necessary to notice is that raised in regard to the lookout on the ship. But as to this no doubt can exist upon the evidence. The man alleged to have been on the lookout is proved to have been seen and spoken to just previous to the collision, upon his station; his reports of the approaching light are proved, and he was seen and spoken to just before the ship went down, lying forward in a dying condition, having been crushed, doubtless, by the spars which fell forward when the vessels struck. Upon this point, therefore, no fault can be found against the ship.

I have now noticed all the material questions of fact and of law which have been raised in this difficult case, and in announcing a conclusion in favor of the libellants, as I do, without hesitation, upon the whole case as it stands, I may add that it is a satisfaction to me to know that the cause, as well because of its importance, as of its difficulty, will without doubt be re-examined in the appellate court, and if I have fallen into error, my decision can there be corrected.

Let a decree be entered in favor of the libellants, with an order of reference to ascertain the amount of the damages.